IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    CRIMINAL NO. 1:18-cr-19/1:18-cr-161 |
| SEAN ANDREW DUNCAN | ) |
| | ) |
| Defendant. | ) |

POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING FACTORS

In accordance with Section 6A1.2 of the *Sentencing Guidelines* and this Court's policy regarding guideline sentencing, the government hereby represents that it has reviewed the Probation Office's presentence report (PSR) and that it does not dispute any of the factors or facts set out therein. Therefore, the guideline sentence is accurately calculated at 360 to 480 months. Pursuant to 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the sentencing range must be between 15 and 20 years. In its plea agreement with the defendant, the United States agreed to argue for a sentence of 20 years. A sentence of 20 years' imprisonment and at least 20 years of supervised release is necessary to reflect the severity of the offenses at issue, to protect the public, and to provide adequate specific and general deterrence.

In this case, Sean Andrew Duncan suspected he was under investigation for terrorism offenses and knew he possessed thousands of videos and images of child pornography when the FBI knocked on his door to search his home on December 29, 2017. In response, Duncan destroyed evidence and ran out the back door.

1

In accordance with the above—as well as the calculations in the PSR—the Court should sentence the defendant to 20 years of imprisonment and at least 20 years of supervised release.

Facts

In January 2015, Duncan reached out to an unnamed co-conspirator (UCC) who is now in the custody of a foreign government for actively planning to travel to join ISIS. After Duncan sent her a friend request, they began communicating through encrypted messaging. UCC told Duncan that she was looking for a "Salafi or an ISIS supporter" to marry and live with in Syria. She believed she would reap "heavenly rewards" if she married an ISIS fighter who died in battle. Duncan told UCC that he was "pro-ISIS" and expressed agreement with an ISIS spokesman's statement that Muslims should be striking their homelands. UCC said Duncan also sent her a link to an article from *Inspire* magazine, entitled, "How to build a bomb in the kitchen of your Mom," which contained pictures and instructions on how to make weapons and bombs. In February 2015, Duncan proposed marriage to UCC and said he wanted her to make "hijrah" with him to Syria. However, UCC said it was too soon, and Duncan and UCC broke contact.

Throughout 2015, Duncan continued to communicate with ISIS supporters in Syria and elsewhere. With one ISIS supporter in Raqqa, Syria, Duncan discussed potentially traveling to Syria and bringing his family.

In January 2016, Duncan re-established contact with UCC and asked her if she still wanted to go to Syria and to be his second wife. UCC declined, and they broke contact again. The next month, Duncan and his wife traveled to Turkey, where they were denied entry and returned to the United States. After their return, Duncan changed his phone number and Facebook account. In December 2016, Duncan told UCC that he and his wife had been sent back

to the United States from Turkey, and that he thought the FBI was monitoring him.

Between March 2017 and June 2017, Duncan used his smartphone to conduct hundreds of internet searches for ISIS-related materials; weapons; terrorists; body armor; surveillance; defense tactics; leaked directory of government employees; watchlist terms; watchlist explanations; and leaked FBI data on terrorist encounters in the USA.

In August 2017, an FBI undercover employee posing as UCC reached out to Duncan to ask about his travel to Syria. Though Duncan denied traveling for the purpose of joining ISIS, he stated that he had never dealt with unnecessary vetting questions because he had always had "referrals." ISIS uses a referral system to recruit new members.

On December 29, 2017, the FBI conducted a search of Duncan's home. After the FBI knocked and announced themselves, Duncan ran out the back door and threw a plastic bag over the heads of the FBI agents there. The bag contained a broken thumb drive that had been submerged in cleaning solution. The FBI has not yet been able to recover the contents of the thumb drive. Inside the home, the FBI recovered notes and videos Duncan had made of the license plate numbers of FBI vehicles that had been surveilling him.

A review of Duncan's smartphones after the search revealed hundreds of images of beheadings of adult men, ISIS fighters and propaganda videos promoting ISIS extremism, along with images of what appeared to be bloodied, deceased children located in a conflict zone.

Further review of Duncan's smartphones also revealed thousands of images of pre-pubescent minors engaged in sexually explicit conduct with adult males or posed to expose their genitalia in a sexual manner. Several of the images were screen shots that Duncan had taken of

websites containing child pornography, and one image even portrayed Duncan's hand exposing the genitalia of one of his female infant relatives in a sexual manner.

Then, in January 2018, while in jail on the obstruction of justice charge, Duncan told his friend, "WB," that the FBI did not know they had both spoken to an ISIS recruiter, whom Duncan called their "mutual friend." The next day, Duncan told his father to tell WB not to "put forth something" the FBI did not know, and instructed his father to tell WB that their "mutual friend" was Allah.

## Argument

The severity of the defendant's offenses, as well as the need to protect the public and provide adequate deterrence, warrant a sentence of 20 years' imprisonment and at least 20 years of supervised release.

The defendant has pled guilty to obstructing a terrorism investigation and receipt of child pornography, two crimes that *each* present an enormous risk to society and are particularly egregious in this case. Here, the FBI may never know all the information Duncan destroyed. Duncan may have destroyed evidence related to his desire to travel to join ISIS, including identifying information for recruiters and facilitators. If so, such information could have helped the United States identify other ISIS supporters in the United States and around the world. The defendant may have also destroyed evidence related to his receipt of child pornography, including photos of additional victims and username accounts of persons distributing such material. If so, such information could have helped the United States prevent further victimization of minors, including Duncan's own relatives and other infants. However, the

United States may never recover and never know what was on the thumb drive Duncan destroyed.

Since pleading guilty, Duncan has met with the government three times for approximately 10 hours. The defense and the government are also arranging a polygraph exam, in accordance with the plea agreement. Though it appears that Duncan has generally provided truthful information, the investigators believe that he also has withheld important information.

Regardless of what was on the thumb drive, a prison sentence of 20 years is necessary to protect the public from Duncan's terrorism-related activity. Duncan advocated support for conducting attacks in his homeland, sent bomb-making instructions to an ISIS supporter, and was interested in trying to travel to join ISIS. A sentence of 20 years is also necessary to protect minors, and particularly infants and Duncan's relatives, from further abuse by the defendant. These young victims are physically incapable of defending themselves against adult male predators.

Finally, a sentence of 20 years is necessary to deter this defendant and others from obstructing justice in terrorism investigations and receiving child pornography. Duncan must also be deterred from committing additional heinous crimes. Duncan's conduct demonstrates a dangerous lack of impulse control. When faced with FBI agents at his door, Duncan destroyed evidence and ran. Then, while charged with the destruction, Duncan again attempted to obstruct justice from jail by instructing WB to say their "mutual friend" was Allah, and not an ISIS recruiter. When presented with the opportunity to abuse his own infant female relative, Duncan took it. This lack of impulse control is particularly dangerous when considered in light of Duncan's attraction to violent jihad.  What happens when Duncan is presented with the

opportunity to engage in violent jihad? What would have happened if Duncan hadn't been turned back to the United States from Turkey? Duncan's lack of impulse control, in combination with his attraction to violent jihad, calls for a sentence of 20 years' imprisonment to achieve specific deterrence.

The government also recommends a supervised release term of at least 20 years. This length of time is necessary to act as a check on Duncan's impulse control after he leaves prison. The government also believes that Duncan would benefit from both the structure that supervised release provides and the additional opportunities to ask for counseling and treatment. Finally, even with a 20-year sentence of imprisonment, Duncan could well be released, with good time credits, before he is 40 years old. Society would be well served by maintaining supervision over someone with Duncan's attraction to violent jihad and interest in child pornography between the ages of 40 and 60.

Nor would a sentence of 20 years of imprisonment and at least 20 years of supervised release be inappropriate in this case. In *United States v. Benkhala*, after determining that the defendant had "obstructed an investigation of a federal crime of terrorism" under Application Note 2 of Section 3A1.4 of the U.S. Sentencing Guidelines, Judge Cacheris sentenced the defendant to 121 months for making false statements to a grand jury, obstructing justice, and making false statements to an FBI Agent. 501 F. Supp. 2d 748, 751 (E.D. Va. 2007), aff'd, 530 F.3d 300 (4th Cir. 2008). *See also United States v. Ashqar*, 582 F.3d 819, 821 & 825 (7th Cir. 2009) (upholding district court sentence of 120 months on an obstruction count for a Palestinian who refused to answer certain questions before a grand jury regarding alleged terrorist acts of Hamas). The charge of receipt of child pornography then carries with it an additional mandatory

minimum of five years' imprisonment, though the Fourth Circuit has affirmed higher sentences in unpublished opinions. *See, e.g., United States v. Lewandowski*, 608 Fed. Appx. 168 (4th Cir. 2015) (upholding sentence of 97 months) and *United States v. Ross*, 307 Fed. Appx. 727 (4th Cir. 2009) (upholding sentence of 108 months). Greater sentences are common where infants or toddlers are involved. *See, e.g., United States v. Maier*, 646 F.3d 1148, 1151 (9th Cir. 2011) (upholding a sentence of 210 months for receipt or distribution of child pornography and a lifetime of supervised release). *See also United States v. Carpenter*, 803 F.3d 1224, 1228 (11th Cir. 2015) (upholding 97-month sentence and lifetime of supervised release for defendant who possessed child pornography depicting pre-pubescent minors and toddlers). Therefore, a sentence of 20 years' imprisonment and at least 20 years of supervised release would not be inappropriate in this case.

Response to Objections

**Substantial Interference**

The defendant objects to an enhancement under Section 2J1.2(b)(2) of the U.S. Sentencing Guidelines for "substantial interference with the administration of justice." However, the defendant's obstruction did cause the "unnecessary expenditure of substantial government…resources." U.S.S.G. § 2J1.1 (Application Note 1).

As a result of Duncan's actions, on December 29, 2017, FBI agents coordinated with FBI Operational Technology Division (OTD) and FBI Laboratory employees to determine the best methods to preserve the destroyed evidence. The FBI Laboratory employees worked into the night to try to assist agents in preserving the data on the destroyed device, after which FBI agents

transported the item to OTD and the lab for chemical analysis. OTD then spent numerous hours analyzing the device, which took place throughout the entire month of January 2018.

The FBI also executed 10 search warrants on at least 19 different facilities to attempt to learn what might have been on the thumb drive. Due to the large volume of the search warrant returns, the contents of the search warrants were manipulated, processed, and preserved by the FBI's Technology Unit so agents could review the content. This process took place from March 2018 to June 2018.

The FBI also conducted over 50 witness interviews between January and June of 2018 and did an extensive review of 34 digital items. Due to the amount of content on the devices, review of the digital items required the analysis of numerous agents, professional staff, and forensic examiners who had to be pulled away from other ongoing FBI investigations related to terrorism and violent crimes against children.

In addition, the FBI coordinated with five foreign government agencies to identify possible terrorism and child pornography victims, and continues to work with local and state police to determine if evidence related to Duncan's son's death was on the thumb drive.  This coordination included extensive foreign travel to identify, and obtain evidence related to, Duncan's infant relative mentioned in the Statement of Facts.

For all these reasons, the government believes the enhancement under Section 2J1.1 is appropriate.

**Information Related to Duncan's Son's Death**

The defendant also objects to the inclusion in the PSR of information related to his son's death. However, under Sections 3553(a) and 3661, the Court may consider the defendant's

history and characteristics when fashioning a sentence. This defendant's history and characteristics include an ongoing investigation into him regarding the death of his son, and the Court may properly consider such information.

## Conclusion

When the FBI came to Duncan's home to execute a search warrant, Duncan already suspected that the FBI was investigating him for terrorism-related offenses and knew he possessed thousands of videos and images of child pornography. Duncan could have stood aside; instead, he destroyed evidence. He then continued to attempt to obstruct justice from jail. For these reasons, a term of 20 years' imprisonment and at least 20 years of supervised release is necessary to reflect the severity of the offenses, protect the public, and afford adequate deterrence to further criminal conduct.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Colleen E. García
Gordon D. Kromberg
Assistant United States Attorneys
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 299-3982 (fax)
Colleen.E.Garcia@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

          /s/
Colleen E. García
Gordon D. Kromberg
Assistant United States Attorneys
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 299-3982 (fax)
Colleen.E.Garcia@usdoj.gov