## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case Nos. 1:18-CR-19,** |
| | ) | **1:18-CR-161** |
| **SEAN DUNCAN,** | ) | |
| | ) | **Hon. Leonie M. Brinkema** |
| **Defendant** | ) | |
| _____ | ) | |

### DEFENDANT'S POSITION WITH REGARD TO SENTENCING

Sean Duncan comes before this Court for sentencing following his guilty plea pursuant to Federal Rule of Evidence 11(c)(1)(C) to one count of obstruction of justice and one count of receipt of child pornography.  Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Duncan, by counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") and offers one objection:  Mr. Duncan objects to the PSR's application of a three-level enhancement under USSG § 2J1.2(b)(2) for obstruction of justice because Mr. Duncan's conduct did not <u>substantially</u> interfere with the administration of justice.

Although he is only 22 years old, Mr. Duncan is fully aware of the serious nature of the charges and accepts that this Court is constrained to sentence him – a young man with no criminal record – to a term of imprisonment of 15 to 20 years.  For the reasons that follow, a term of imprisonment of 15 years, in addition to a reasonable period of supervised release, in conjunction with the collateral

consequences Mr. Duncan will face as a convicted sex offender, are sufficient to satisfy the sentencing goals of 18 U.S.C. § 3553(a).  Sean Duncan is not a hardened career criminal.  He is a very young man who has demonstrated the desire and capacity for rehabilitation as he gains maturity and reflects on his conduct.  The upshot is that Sean knows he will spend at least the next 15 years of his life in federal prison.  An additional 5 years will do nothing more to achieve the goals of sentencing and are therefore unnecessary.

## I.   OBJECTION TO PSR

Application of a three-level enhancement pursuant to USSG § 2J1.2(b)(2) is inappropriate in this case because Mr. Duncan's obstruction of justice offense did not "result[] in <u>substantial</u> interference with the administration of justice."  USSG § 2J1.2(b)(2) (emphasis added).  "Substantial interference with the administration of justice" includes, in pertinent part, "the unnecessary expenditure of substantial governmental . . . resources."  *Id.* at § 2J1.2, Application Note 1.

Mr. Duncan's obstruction of justice charge is based on his destruction of a thumb drive during the FBI's execution of a search warrant at his residence.  Statement of Facts, ECF No. 26 ¶¶ 28-33.[2]  That thumb drive contained child pornography, and he destroyed it to prevent its discovery.  The destruction of this thumb drive, therefore, did not substantially interfere with the terrorism investigation.  It did not result in the "unnecessary expenditure of substantial

---

[2]   Notably the PSR also recommends a two-level increase for this same conduct pursuant to § 2J1.2(b)(3), PSR ¶ 69, which Mr. Duncan does not contest.

governmental . . . resources." Indeed there is no reference in the PSR to any specific unnecessarily expended governmental resources, let alone <u>substantial</u> resources. *See United States v. Weissman*, 22 F. Supp. 2d 187, 196 (S.D.N.Y. 1998), *aff'd*, 195 F.3d 96 (2d Cir. 1999) (requiring government to: "(1) identify a particular expenditure of governmental resources (time or money) (2) which but for the defendant's conduct would not have been expended and (3) was 'substantial' in amount, as that adjective is used in common parlance") (footnote omitted). The government asserts a wide array of governmental resources expended as part of this investigation but fails to show that any <u>substantial</u> resources were expended <u>as a direct result</u> of the destruction of the thumb drive. ECF No. 32, Gov't Memo at 7-8. The absence of any facts substantiating application of this enhancement easily distinguishes this case from others in which the enhancement has been applied. *See, e.g., United States v. Hartz*, 64 F.3d 660 (Table) (4th Cir. 2007) (approving enhancement where defendant created false reports, which directly caused the government to procure additional evidence, interview additional witnesses, and prepare rebuttal to false reports).

## I.   APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

The primary directive of § 3553(a) is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Pursuant to *United States v. Booker,* courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors enumerated in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 259-60 (2005).[4] In *United States v. Gall*, the

---

[4] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c)

Supreme Court stressed that "the Guidelines are only one of the factors to consider when imposing sentence." *See United States v. Gall,* 552 U.S. 38, 49 (2007).

After *Booker* and *Gall,* therefore, sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of § 3553(a). Moreover, there is no presumption that the advisory range is the minimally sufficient sentence that § 3553(a) requires this Court to determine and impose. *See Gall,* 552 U.S. at 50. (sentencing court "may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." (internal citation omitted)).

### A.    Sean's History and Characteristics

Sean Duncan was 21 years old at the time of his arrest and was a teenager when he committed much of the conduct discussed in the statement of facts. The Probation Officer's detailed description of Sean's life before his arrest, along with the attached psychological evaluation, *see* Exhibit 1 ("DeRight Report"), describe a teenager ███████████████████████████████ and struggling to

---

the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

find his place in the world after a childhood marred by instability and significant traumatic events.

### 1.    *Turbulent Early Childhood*

At first blush, Sean had a typical lower-middle class life, but beneath the surface his childhood was turbulent, unstable, and depressingly lonely. Sean was born in 1996, to the married, but distinctly unhappy, union of Laurie and Gary Duncan. Laurie worked in real estate and as a grocery store manager, and Gary worked at Giant Foods. Sean was the youngest of three children. His older siblings, Victoria and Todd, were from Laurie's previous marriage. As a child, Sean was quiet and kept to himself. His family describes him as a "thoughtful," "considerate," and "well-behaved" child. Exhibit 2, Letter of Joan Ruth.[5] According to his mother, when he was a baby, they lived in an old row home in Baltimore where he was exposed to lead paint and testing revealed he had elevated lead levels.[6]

Sean's parents separated when he was eight years old, and he spent years thereafter bouncing around between his mother's and father's homes during their protracted separation,[7] often caught in the middle of their heated arguments. When

---

[5]    Letters in support of Mr. Duncan are attached hereto as Exhibit 2. Now, although united in their support for Sean, the tension between the maternal and paternal side of Sean's family is evident in their letters to the Court.

[6]    Undersigned counsel obtained Sean's pediatric records from a Johns Hopkins Health Care Center, which confirm that a capillary test revealed elevated lead levels. Even slight elevations in lead levels have been associated with difficulty regulating impulse control among children. *See* DeRight Report at 6;, *Low Blood Lead Levels Associated with Clinically Diagnosed Attention-Deficit/Hyperactivity Disorder and Mediated by Weak Cognitive Control*, Biol Psychiatry, 2008 February 1.

[7]    Sean's parents did not legally divorce until 2017.

he stayed with his mother he had to sleep on the couch and was subject to verbal disputes with his grandmother and physical disputes with his uncle. When he stayed with his father he was subject to living in a home in utter disrepair and the physical and verbal abuse of his father. *See* PSR ¶ 105; DeRight Report at 3.[8] At age 12, Sean's family problems were so severe that his pediatrician was consulted. DeRight Report at 3. Sean reportedly did not feel safe in his own home and would often wake up during the night to check the locks. *Id.* As a result of moving frequently, Sean attended several different schools, was homeschooled for a period, and never had the benefit of a consistent academic or social setting. He has a childhood history of excessive truancy and school avoidance due to many different reasons further described below, including depression, anxiety, and bullying. DeRight Report at 2-4, 7.[9] He spent a lot of time alone, unsupervised in front of the television. He did not have many friends growing up.

The general instability Sean experienced during his formative years was severely exacerbated by two additional and significant traumatic events, the profound impacts of which were not fully appreciated by him and his parents until his arrest for the instant offenses. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[8]    Fortunately, Sean and his father have since mended their relationship.

[9]    In 9th grade, Sean was suspended from his school – Patapsco High School – for missing too many days of school. He completed 9th grade at Rosedale Academy, before transferring to yet another school – Patterson High School – where he completed his high school degree. DeRight Report at 3.



Second, when Sean was about 11 years old, and in the midst of dealing with his parents' tense and hostile separation, his best friend died suddenly from a heart condition. Sean was deeply shaken by his friend's death, and did not understand how to process it. He missed three weeks of school due to excessive crying and bereavement and was seen by a mental health professional only once. *Id.* at 7.

### 2.    *Isolated As a Teenager*

Sean was 14 years old when his mother decided to move to Delaware. Not wanting to leave Baltimore, Sean moved in with his father permanently. His father's house was small, dilapidated, and unsuitable for habitation generally, let alone habitation by a child. There, Sean either shared a bed with his father or slept on the couch. When Sean moved, he also transferred to Patterson High School, a large, inner-city public school. Sean did not have an easy time transitioning to Patterson. For many months, he did not have a single friend. He became withdrawn and depressed. Many days he would not get out of bed. He missed so much school that he was at risk of failing out. It was during this period that Sean—who had come of age in the internet era and was adept at computers—became obsessed with his online

activities. He began corresponding with others online using different anonymous identities and obsessively looking at pornography websites. His mother observes that during this period "he spent many hours on the computer and [was] up all night playing video games." Exhibit 2, Letter of Laurie Duncan.

3. 

### 4. *Religious Conversion and Introduction to Extremist Ideology*

During the summer before Sean's senior year – much of it spent online – Sean discovered Arabic and the Quran. Sean researched Muslim prayer, and found it

particularly beautiful.  He told Dr. DeRight that he often felt a "spiritual high" after praying that left him feeling "centered and relieved."  DeRight Report at 4.  Upon returning to school in the fall, Sean contacted a Muslim classmate.  His classmate introduced him to a new circle of potential friends, among whom Sean immediately felt welcome and included, which was a new and comforting experience for Sean. These classmates converted Sean to Islam.  For the first time, Sean felt like he had an identity.  *Id.* at 4.  But these new friends were restricted to the school setting and showed no interest in engaging with Sean in social activities outside school.  *Id.* at 5. Consequently, after graduating from high school in 2014, Sean sought to join a mosque and became involved in the Masjid Zam Zam Mosque.  He eventually made many acquaintances at the Mosque, none of whom were radical or extremist in any way.   There he met his mentor, W.B., who later tried to steer Sean away from extremist versions of Islam.   W.B. has been interviewed by the FBI on multiple occasions.  There is no evidence that W.B. is extremist.  Indeed, he advised Sean that he would tell the FBI that "ISIS was actively trying to recruit" Sean, and apparently, he was forthcoming with law enforcement.  PSR ¶ 48.

When Sean was unable to continue meeting with W.B., he tried to find a Muslim community online.  But what he found online was an entirely different and dangerous version of Islam.  Through Facebook and other social media sites, he met individuals who espoused extremist views and justified those views by invoking the teachings of certain Muslim sheiks that Sean revered.  In reality these sheiks were not extremists, and nor were their teachings, but Sean's immaturity, religious inexperience, and

desire to fit into a community rendered him vulnerable to these types of arguments from virtual strangers.[10]  His correspondences on Facebook and elsewhere led him to message groups on encrypted platforms where ISIS recruitment videos and essays were distributed.  Already troubled by the Syrian war, Sean was drawn into ISIS propaganda videos, which invoked the Quran's verse "eye for an eye" as justification for perceived western aggression in Syria and Iraq.  Sean's nominal interest in extremist ideology blossomed when he met two attractive women online who appeared to be radicalized.  He flirted with them, including by boasting of his desire to fight in Syria.  Sean never intended to actually fight in Syria, and his underlying motivation for these comments was an embarrassingly juvenile one: he wanted to see them naked.  DeRight Report at 6.  Not surprisingly, Sean's online puffery never translated into a concrete, specific plan to fight.   Looking back on his foray into extremism, Sean explains,"[m]uch like a gang member might exaggerate his standing to impress a certain type of woman, I also engaged in this thoughtless activity, except in reality, I was a poser."  Exhibit 3, Letter of Sean Duncan.

In February 2015, when Sean was 18 years old, he met his wife, Zakiya Sadeq, at an Arabic language class.  Despite a fifteen-year age difference, the two hit it off and married ten months later in December 2015.  Sean's family, who were still coming to terms with his recent conversion, initially objected to the marriage.  Their concerns were not unfounded.  At 19, Sean − a recent high school graduate with no career or

---

[10]    When Sean began exhibiting signs of sympathy towards extremist ideals, he was effectively ostracized from his real-world Muslim community, which drove him even deeper into the virtual world.

higher education plans – was not mature enough to take on the responsibility of marriage and children.  However, his father ultimately supported his son's decision and later traveled to visit the couple when they moved to Pittsburgh where Zakiya, a medical doctor, had landed a fellowship.

When Sean met Zakiya in 2015, he was corresponding with radicalized individuals online, primarily with young women with whom he continued to flirt. Although Sean paid lip-service to the idea of joining ISIS to impress and flirt with these young attractive women (unbeknownst to Zakiya), he never developed an actual plan to fight.  His mother, disturbed by Sean's conversion, notified the FBI that Sean and Zakiya were planning to travel to Turkey for their honeymoon in February 2016. They were planning to travel to Turkey and then on to Bangladesh for a wedding ceremony with Zakiya's family.  They had no plan to go to Syria or to fight with ISIS. Upon arriving in Turkey, they were detained in the airport, interrogated, denied entry, and deported back to the U.S.

Shortly after their aborted trip, they moved to Pittsburgh for Zakiya's medical fellowship.  Once in Pittsburgh, Sean became increasingly depressed and isolated. While Zakiya worked, he stayed home alone.  He missed his mosque community, from whom he had become both literally and figuratively distanced, and felt he did not fit in with the Islamic community in Pittsburgh.  He spent countless hours online, chatting with strangers and bingeing on legal and illegal pornography.

In January 2017, Zakiya gave birth to their son.  Tragically, six months later, the baby died in their home.  The police reports indicate that Zakiya reported that

the baby had aspirated on formula and formula was observed around the baby's mouth. PSR ¶ 108. The autopsy ruled the cause of death as inconclusive. Sean was devastated by his baby's death, and his depression worsened.[11] The couple returned to the northern Virginia area in June of that year. In December 2017, Sean was arrested and charged with obstruction of justice for attempting to flee and destroying a thumb drive containing child pornography when law enforcement came to his home to execute a warrant. He has since accepted responsibility for obstruction of justice and receipt of child pornography.

## II.    Nature and Circumstances of the Offenses Charged

Sean admits he obstructed an investigation into his connections to terrorist organizations, namely ISIS, and the plea agreement reflects the seriousness of this offense. It is now clear that Sean never had any concrete, specific plan to fight with ISIS or otherwise carry out any act of terrorism. Other than making passing, and

---

[11]    The government has suggested Sean may have been involved in the death of his infant child in June 2017. According to the PSR, the child's death is under review by the Pennsylvania authorities. PSR ¶ 55. Sean denies that he had any involvement in his child's death, and the court should not give any weight to the government's allegation. This is especially true where Sean has never been charged with any wrongdoing and the government's cited support for its position is far from sufficient for this court to give it any credence. *See United States v. Horton*, 693 F.3d 463 (4th Cir. 2012) (a sentencing court may only consider uncharged conduct in determining a sentence if the conduct is supported by a preponderance of the evidence); *United States v. Taylor*, 368 F. App'x 350, 353 (4th Cir. 2010) (declining to consider evidence about uncharged murder allegation where government had "no direct evidence"). The Court should not permit the tail to wag the dog and essentially transform this sentencing proceeding from one primarily based upon the offenses to which Sean pleaded guilty into one substantially affected by unproven and highly disputed allegations of extraordinarily prejudicial ancillary conduct that is entirely unrelated to the offenses of conviction.

albeit disturbing, comments on the internet, he did not provide any type of support, monetary or otherwise, to ISIS.  Sean was a confused, lonely teenager, contending with unresolved childhood trauma and untreated mental illness, who was especially susceptible to online extremist recruiters.[12]  At his weakest moments, shrouded in anonymity, he was easily drawn into the dark underbelly of the internet, where he looked at content and made statements inconsistent with his public persona.  His flirtation with extremism lasted for a brief period.  In fact, by the summer of 2017, he was publicly disclaiming extremism.  When the undercover informant pretending to be a woman with whom Sean had struck up a flirtation contacted him in August 2017, and attempted to draw him into a conversation about fighting in Syria, Sean advised, "you should not go," and then urged the undercover informant to start "an afterschool group" in Malaysia instead of fighting in Syria.

Sean also admits he received child pornography.  Sean's addiction to legal pornography devolved into an addiction to increasingly taboo and illegal pornography, as Sean continued to seek an escape from reality by means of the virtual online world. ████████████████████████████████████

████████████████████████████████████████████

██████ ████████ ████████ █ ████████ ████████ ████████ ██████ ████

████████████████████████████████  ████████████████

████████████████████████████████████████████

---

[12]    Indeed, understanding Sean's vulnerability and brush with extremism will be useful to the federal government's efforts to combat extremism and radicalization among other vulnerable youths.



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.[13]   He is eager to
help other young men like himself who might be vulnerable to extremists' pernicious
recruitment tactics.  He credits non-extremist members of his mosque for their efforts
to help pull him back from becoming fully radicalized, and he wants to do the same
for others in the future.

## III.    Relevance of Sean's Age

Mr. Duncan was very young when he became addicted to pornography and 20
years old when he committed the instant offenses.  The government highlights the
impulsive nature of Mr. Duncan' crimes and it is correct to do so.  Recent studies of
the adolescent and developing brain suggest that he can and will grow out of his
impulsive behavior.

"Emerging science about brain development suggests that most people don't
reach full maturity until the age of 25." NPR, Brain Maturity Extends Well Beyond
Teen Years (Oct. 10, 2011).   Well-accepted studies of the brain conclude that its
development may not be complete until the age of twenty-five.  *See, e.g.,* Elizabeth
Williamson, Brain Immaturity Could Explain Teen Crash Rate, Washington Post,
February 1, 2005 (summarizing National Institute of Health study that suggests

---

[13] █████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████████████
██████████

"that the region of brain that inhibits risky behavior is not fully formed until age 25"). The Supreme Court recognized this years ago when it banned capital punishment of minors. *Roper v. Simmons*, 543 U.S. 551, 572-73 (2005). In *Roper*, the Supreme Court observed the "marked and well understood" differences in culpability between adults and youth and relied on studies showing that adolescents are less culpable for their actions than adults: "[A]s any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *Roper*, 543 U.S. at 569 (citations omitted). "It has been noted that 'adolescents are over represented statistically in virtually every category of reckless behavior.'" *Id.* (quoting Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992)).

Two years later, the Supreme Court relied on the youth of the defendant in sentencing a twenty-one year old defendant to probation for drug distribution. *United States v. Gall, 552* U.S. at 28 (2007). The government would likely argue that Mr. Duncan's offenses are a far cry from Mr. Gall's offenses, but that response misses the point: concerns about brain development support a different view of offenses committed by youthful offenders. Sean's offenses-—impulsive in their nature— speak to his youth and immaturity. His juvenile recklessness was exacerbated by spending countless hours online, losing himself in online forums in which posters hid

behind anonymity and drew him into a dark and dangerous world. He became emboldened by his online relationships with individuals (women, in particular) who flattered him and gave him a sense of belonging and significance. For Sean, a depressed and socially isolated teenager, this sense of belonging and importance overtook him and in the anonymity of the online world, he did and said things that were totally inconsistent with his outward persona.

Moreover, Sean's youth and desire to become a productive member of society in the future provide a significant reason to impose a more moderate punishment, precisely because he has the potential to change and grow into a completely different, and law abiding, person in the future. Even in cases involving charges of material support of terrorist groups, judges have recognized that a defendant's youth, immaturity, and potential to change constitute substantial reasons that weigh in favor of a more moderate punishment. *See* Associated Press, *Houston Man Recruited by ISIS Gets 18 Month Prison Term*, New York Times, June 26, 2018.[14]

## IV. The Seriousness of the Offense, Respect for the Law, The Need for Deterrence and Just Punishment.

While the investigation into Sean's conduct began as a terrorism investigation, it is now clear that he was in no way involved in terrorism or meaningfully connected to a terrorist group. He never provided any support to a terrorist organization. His juvenile curiosity about extremist ideology was passing and undeveloped. Indeed, he

---

[14] Available at: https://www.nytimes.com/aponline/2018/06/26/us/ap-us-islamic-state-houston.html/

admitted that he made boastful online comments to women he never met in person because he wanted to date them, not because he had any real desire to fight.

Instead of revealing a young man who had been fully radicalized, the government's investigation exposed a young man, dealing with unresolved trauma and ███████████████, who had developed an addiction to child pornography and other reckless online behaviors. Since his arrest, Sean has gained incredible insight into his own behaviors. He has engaged in self-examination to identify the motivations underlying his conduct. ████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████ Exhibit 3, Letter of Sean Duncan. He is cognizant of the real life harm to the victims here. *Id*. ("I am devastated that I allowed my problems to spiral out of control to the point that it had a negative impact on others."). He is open to sex offender and mental health treatment and is looking forward to making something of his life, notwithstanding the significant sentence he faces. He also has acknowledged and been pained by the harm his conduct has caused to his family, while gaining insight into how to cope with his mother and father's continuing hostility towards one another. Although still coping with the shock of Sean's conviction, his family has rallied around him. While they obviously do not condone his conduct, they have made clear that they will remain by his side, to support him through the lengthy incarceration and to assist him with re-entry when he gets out. His mother writes,

"I will always be here for my son now and when he is released." Exhibit 2, Letter of Laurie Duncan.

Sean's self-awareness, openness to treatment, and family support will serve him well when he is finally released. Dr. DeRight observed that Sean "shows the capacity for insight and self-awareness, suggesting that he would respond well to treatment. ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████." DeRight Report at 12.

Sean is 22 years old. He has no criminal record. If this Court imposes a sentence of 15 years, he will be middle-aged by the time he emerges from prison. Moreover, the 15 years he serves will be what are usually among the most momentous of any young man's life. Sean will miss those formative years. When he gets out, he will be subject to a significant period of supervised release. Indeed, Sean consents to a longer period of supervision if it would assure the Court that no more than 15 years is necessary for the incarceration component of his penalty. Sean also will have to register as a sex offender and will be tagged with that label for the rest of his life. As a result, he will face not just the standard obstacles confronted by all felons returning to society, but the even more significant challenges and stigma confronted by someone returning as a registered sex offender.

These substantial consequences in addition to a 15-year prison term are sufficient to punish Sean for his conduct at issue here and to send a commanding

message of deterrence. A longer sentence for this first-time offender will not have a greater deterrent effect than the effect spending some of his most productive years in federal prison – followed by a lifetime of stigma – already will have. Even the Department of Justice acknowledges that longer periods of incarceration do not tend to result in increased deterrence. *See* USDOJ, Nat'l Inst. of Justice, *Five Things About Deterrence* ("Increasing the severity of punishment does little to deter crime.").[15]

## CONCLUSION

For the foregoing reasons the defendant respectfully requests that the Court impose a sentence of 15 years of imprisonment, accompanied by a period of supervised release.

Respectfully submitted,

SEAN DUNCAN

By Counsel,

Geremy Kamens,
Federal Public Defender

_/_s/_____
Geremy C. Kamens
Virginia Bar No. 41596

Elizabeth A. Mullin
Virginia Bar No. 86668

Elsbeth Bennett

---

[15]      Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last accessed June 20, 2018).

(admitted pro hac vice)

Attorneys for Defendant
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA   22314
(703)600-0800 (telephone)
(703)600-0880 (facsimile)
elizabeth_mullin@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2018, I will electronically file the foregoing with the Clerk of court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gordon Kromberg, Esq.
Colleen Garcia, Esq.
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA   22314

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the forgoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____
Elizabeth A. Mullin
Attorney for Defendant
Virginia Bar No. 86668